**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *Caption in Compliance with D.N.J. LBR 9004-1(b)*<br><br>Martin Domb (application *pro hac vice* pending)<br>martin.domb@akerman.com<br>Mark S. Lichtenstein<br>mark.lichtenstein@akerman.com<br>AKERMAN LLP<br>1251 Avenue of the Americas, 37th Floor<br>New York, NY 10020<br>Tel.: (212) 880-3800<br><br>John Thompson (application *pro hac vice* pending)<br>john.thompson@akerman.com<br>AKERMAN LLP<br>750 Ninth Street, N.W., Suite 750<br>Washington, D.C. 20001<br>Tel.: (202) 824-1760<br><br>*Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC* | |
| In re:<br><br>1 THRASIO ONE, INC.,<br>         *Reorganized Debtor.* | Chapter 11<br>Case No. 24-11850-CMG<br>(Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br>         *Plaintiff,*<br>v.<br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; AND YARDLINE CAPITAL CORP.,<br>         *Defendants.* | Adv. Pro. No. 24-01637-CMG<br><br><br>**NOTICE OF MOTION:**<br>**MOTION TO WITHDRAW THE REFERENCE** |

    PLEASE TAKE NOTICE that, upon the Complaint in this adversary proceeding,

including items referenced in or that are integral to the Complaint, defendants Joshua Silberstein

and Everything's Coming Up Millhouse, LLC will move the United States District Court for the

District of New Jersey, on a day and time to be set by that Court, for an order, pursuant to 28 U.S.C. § 157(d), withdrawing the standing reference to the Bankruptcy Court with respect to the above-captioned Adversary Proceeding, Case No. No. 24-01637-CMG, and transferring said Adversary Proceeding to the United States District Court for the District of New Jersey, and for such other or further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, as directed in D.N.J. Local Bankruptcy Rule 5011-1, this Notice of Motion and its supporting memorandum of law (with exhibits) are being filed with the Clerk of the Bankruptcy Court, the Clerk "will transmit the motion to the district court," and "[a]ll papers filed after the initial motion must be filed with the clerk of the district court."

Dated:  February 18, 2025

*s/ Mark S. Lichtenstein*

_____

Martin Domb (application *pro hac vice* pending)
martin.domb@akerman.com
Mark S. Lichtenstein
mark.lichtenstein@akerman.com
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel.: (212) 880-3800

- and -

John Thompson (application *pro hac vice* pending)
john.thompson@akerman.com
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel.: (202) 824-1760

*Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC*

Copy to counsel for all parties in this Adversary Proceeding, via ECF

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| *Caption in Compliance with D.N.J. LBR 9004-1(b)*<br><br>Martin Domb (application *pro hac vice* pending)<br>martin.domb@akerman.com<br>Mark S. Lichtenstein<br>mark.lichtenstein@akerman.com<br>AKERMAN LLP<br>1251 Avenue of the Americas, 37th Floor<br>New York, NY 10020<br>Tel.: (212) 880-3800<br><br>John Thompson (application *pro hac vice* pending)<br>john.thompson@akerman.com<br>AKERMAN LLP<br>750 Ninth Street, N.W., Suite 750<br>Washington, D.C. 20001<br>Tel.: (202) 824-1760<br><br>*Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC* | |
| In re:<br><br>1 THRASIO ONE, INC.,<br>                            *Reorganized Debtor.* | Chapter 11<br>Case No. 24-11850-CMG<br>(Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br><br>                            *Plaintiff,*<br><br>v.<br><br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; AND YARDLINE CAPITAL CORP.,<br><br>                            *Defendants.* | Adv. Pro. No. 24-01637-CMG |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS JOSHUA SILBERSTEIN AND EVERYTHING'S COMING UP MILLHOUSE, LLC TO WITHDRAW THE REFERENCE

## Table of Contents

Introduction.................................................................................................................1

Factual Background ....................................................................................................2

Procedural History .....................................................................................................7

Legal Standards..........................................................................................................7

ARGUMENT

I.      THIS MOTION IS TIMELY ..............................................................9

II.     THERE IS COMPELLING CAUSE TO WITHDRAW
THE REFERENCE IN THIS CASE..............................................................10

       A.     Most of the Claims are Non-Core; and Those That Are Core Are
So in Name Only, Arise Under State Law, and Are Based on the
Same Factual Allegations As the Non-Core Claims...............................10

       B.     This Is an Exceptionally Complex Case; the Complaint
Alleges Twenty-Six Claims Against Eleven Defendants ......................13

       C.     The Case Will Require Very Extensive Discovery, Expert
Witnesses in Multiple Disciplines, and a Lengthy Trial.......................17

       D.     This Post-Confirmation Adversary Proceeding Concerns
Pre-Petition Claims; Involves Matters the Bankruptcy Court
Has Not Dealt With, and Requires No Bankruptcy Court Expertise...................20

       E.     The Bankruptcy Court Lacks Article III Jurisdiction To Enter
Judgment on Most of the Claims or Hold a Jury Trial on All Claims.................23

Conclusion .............................................................................................................26

79932960;1

**Table of Authorities**

**Cases**

*Adelsperger as Trustee for Consolidated Bankruptcy Estate of 5 Star Commercial,
LLC v. 3d Holographics Medical Imaging Inc.*, 2019 WL 2206091
(N.D. Ind. May 21, 2019) ....................................................................................25

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995).............................................................................................22

*Chatz as Tr. of Creditor Tr. created by Operation of Amended Joint Liquidating
Plan of Reorganization v. World Wide Wagering, Inc.*,
No. 17 C 4229, 2018 WL 11189350 (N.D. Ill. Feb. 26, 2018)...................................8

*Germain v. Connecticut Nat. Bank*,
988 F.2d 1323 (2d Cir. 1993)................................................................................23

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)..........................................................................................23, 24

*In re BWI Liquidating Corp.*,
437 B.R. 160 (Bankr., D. Del. 2012) ....................................................................22

*In re Complete Management, Inc.*,
2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002).........................................9, 12, 19, 20

*In re Dandridge*,
2019 WL 6337420 (W.D. Va. Nov. 26, 2019) ......................................................25

*In re Enron Creditors Recovery Corp.*,
410 B.R. 374 (S.D.N.Y. 2008)................................................................................8

*In re Leedy Mortg. Co., Inc.*,
62 B.R. 303, 306 (E.D. Pa. 1986) ..............................................................9, 19, 20

*In re NDEP Corp.*,
203 B.R. 905 (D. Del. 1996).................................................................................20

*In re One2One Commc'ns, LLC*,
805 F.3d 428 (3d Cir. 2015).................................................................................23

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir. 1993)...............................................................................9, 25

*In re Resorts Intern. Inc.*,
  372 F.3d 154 (3d Cir. 2004)..........................................................11, 21, 22

*In re Tribune Media Co.*,
  902 F.3d 384 (3d Cir. 2018)........................................................................24

*Roman Catholic Diocese of Rockville Centre, New York v. Certain Underwriters
  At Lloyds, London*, 634 B.R. 226, 234 (S.D.N.Y. 2021) ....................12, 23

*Securities and Exchange Commission v. Jarkesy*,
  603 U.S. 109 (2024)....................................................................................24

*Stern v. Marshal*,
  564 U.S. 462 (2011)....................................................................................23

*Wellness Int'l Network, Ltd. v. Sharif*,
  575 U.S. 665 (2015)....................................................................................25

**Statutes, Rules, and Other Authorities**

1 *Collier on Bankruptcy* (16th ed.) ¶ 3.04 ...............................................12

1 *Norton Bankr. L. & Prac.* 3d § 8:1 (2024 update).........................9, 12, 19

11 U.S.C. § 544 ....................................................................................... 10-11

11 U.S.C. § 548 ............................................................................................10

11 U.S.C. § 550 ....................................................................................... 10-11

28 U.S.C. § 157(a) .........................................................................................8

28 U.S.C. § 157(b)(2) ...................................................................................10

28 U.S.C. § 157(b)(2)(H) ........................................................................10, 24

28 U.S.C. § 157(d) .................................................................................1, 2, 12

28 U.S.C. § 157(e) ........................................................................................24

28 U.S.C. § 1334(b) ........................................................................................7

U.S. Constitution, Seventh Amendment ......................................................23

U.S. District Court, D.N.J. Standing Order of Reference 12-1 (Sept. 18, 2012)............................8

Defendants Joshua Silberstein ("Silberstein") and Everything's Coming Up Millhouse, LLC ("Millhouse") submit this memorandum of law in support of their motion under 28 U.S.C. § 157(d) to withdraw the standing reference to the Bankruptcy Court with respect to this adversary proceeding.

## Introduction

This adversary proceeding should not be litigated in the Bankruptcy Court, where it was recently commenced, because (among other reasons discussed below):

(a)  most of the alleged claims are non-core, and *all* claims arise under state law;

(b)  the case was commenced months after the Bankruptcy Court confirmed a reorganization plan ("Plan") and closed the bankruptcy case;

(c)  the case is highly complex – the complaint alleges 26 disparate claims against 11 defendants – and will require very extensive document discovery, dozens of depositions, and multiple expert witnesses;

(d)  the District Court will have to preside at the trial and determine the facts and law in entering judgment, because the Bankruptcy Court lacks Article III jurisdiction to either enter judgment on the non-core claims or to preside over a jury trial on all claims; and

(e)  all claims concern events that occurred years before the debtor ("Thrasio") filed its chapter 11 petition on February 28, 2024, they could have been brought before the bankruptcy case was commenced, and the case does not concern the administration of the bankruptcy estate or require specialized bankruptcy court expertise or supervision.

The only connection this adversary proceeding has to the now-closed bankruptcy case is that the Plan created and authorized the plaintiff ("Trust") to pursue potential claims against the named defendants in the hope that they might generate proceeds for distribution to Thrasio's

unsecured creditors, for whom the Plan otherwise provided zero distributions. Even if the claims ultimately generated any proceeds, the Bankruptcy Court would have no role in their distribution, because the Plan includes a precise formula that directs to whom and in what amounts the proceeds would be distributed.

This is a *compelling* case for the District Court to exercise its discretion under 28 U.S.C. § 157(d) and withdraw the reference so that the case will be litigated in the District Court, where it belongs.

## Factual Background[1]

### Thrasio Is Founded in April 2018

Defendants Joshua Silberstein and Carlos Cashman co-founded Thrasio in April 2018. Thrasio's business was – and still is after emerging from bankruptcy – to acquire businesses that sell consumer products through amazon.com and other e-commerce outlets and consolidate them into Thrasio's platform, thereby expanding sales through economies of scale and other synergies. Thrasio was among the first companies to pursue this business model; these companies are known as "aggregators." *See* Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., in Support of First Day Motions (Bankr. Doc. 38) (Burke Decl.") (Ex. B) ¶¶ 1-2.

Silberstein and Cashman served as co-CEOs and directors of Thrasio from its inception. Silberstein left Thrasio on September 25, 2021, in accordance with a negotiated separation agreement. Complaint (Ex. A), ¶¶ 121-122. Cashman remained as CEO for nearly another year,

---

[1]  The sources for the factual statements in this section are non-conclusory allegations in the complaint (assumed to be true only for purposes of this motion), documents filed on the Bankruptcy Court docket for the underlying chapter 11 case (case no. 24-11840-CMG) (cited herein as "Bankr. Doc. ___"), and public information of which the Court may take judicial notice. We submit the complaint, as well as certain documents filed in the bankruptcy case and referred to herein, as exhibits to this memorandum.

until August 1, 2022, and as a director until the Plan was confirmed in June 2024. Complaint ¶ 126; Disinterested Directors' Report ("DD Report"), Bankr. Doc. 805 (Ex. C), ¶ 6 (table).

**Thrasio's Rapid Growth During Silberstein's Tenure**

Thrasio's business grew rapidly during its first three years under the leadership of Silberstein and Cashman. According to its *audited* annual financial statements, Thrasio's sales revenue grew from about $4 million in its first nine months (from inception through December 31, 2018), to about $53 million in 2019 and about $345 million in 2020. Sales revenue for 2021 (which ended three months after Silberstein's departure in September 2021) grew to about $891 million, and reached $1.26 billion in 2022 (the last year for which Thrasio gave Silberstein copies of its audited financial statements). Thrasio was one of the fastest companies to have reached a $1 billion valuation.[2]

This growth, fueled significantly by increased e-commerce demand during the early stages of the Covid pandemic (which began in early 2020) required considerable financing, which Thrasio obtained via loans and equity investments. Thrasio issued several series of preferred shares to investors led by highly sophisticated private equity firms, as summarized in the following table:

[*Table appears on next page.*]

---

[2]  As reported in a press release by Cooley LLP, which represented Thrasio in the July 2020 equity financing cited in the Complaint (¶ 59), "Thrasio Hits Unicorn Status With Series C Funding" (https://www.cooley.com/news/coverage/2020/2020-07-22-thrasio-hits-unicorn-status-with-series-c-funding) (last viewed Feb. 14, 2025).

| Closing Date | Series | Lead Investor(s) | Amount Raised |
|---|---|---|---|
| April 2019 | Seed | Peak6 Group LLC | $6.5 million |
| Dec. 2019 / Feb. 2020 | Series A | Peak6<br>Upper90<br>Solamere Capital | $14.8 million |
| March / June 2020 | Series B | Peak6<br>Upper90 | $72.6 million |
| July / Aug. 2020 | Series C-1 | Advent International Corporation | $259.1 million |
| Feb. 2021 | Series C-2 | " | $250 million |
| March / May 2021 | Series C-3 | " | $100 million |
| Feb. & Aug. 2021 | Series X | Oaktree Capital Management, L.P. | $447 million |
| Oct. & Dec. 2021 | Series D | Silver Lake Partners, Advent | $1,065 million |
| **Total** | | | $2,215 million |

Sources:  Audited financial statements of Thrasio for the year 2020, Note 10 at 24-25; Burke Decl. (Ex. B) at 13-15; DD Report (Ex. C) ¶ 45.

Notably, the Series D financing, which raised more than $1 billion, was concluded in late 2021, *after Silberstein's departure from Thrasio*, on the basis – accepted by the lead investors after thorough due diligence – that Thrasio at that time had a valuation of $6 billion.[3]

**Thrasio Files for Bankruptcy in February 2024**

Thrasio filed a chapter 11 petition on February 28, 2024, two years and five months *after Silberstein had left Thrasio*. Plaintiff alleges that Silberstein, along with the other defendants, "drove Thrasio into bankruptcy." Complaint ¶ 129. Yet, during the 29 months preceding the bankruptcy filing – when Silberstein was not involved at all with Thrasio (except for his continuing to hold a large number of shares that became worthless upon the bankruptcy filing) –

---

[3]  News articles about the Series D issuance have cited the $6 billion valuation. *E.g.*, "Oaktree issues mea culpa to Advent and Silver Lake for 'serious error in judgment'" (https://wdctv.news/oaktree-issues-mea-culpa-to-advent-and-silver-lake-for-serious-error-in-judgment/) (last viewed Feb. 14, 2025).

Thrasio hired a series of senior officers and advisors, changed its roster of directors, and made business decisions, all of which indisputably contributed to Thrasio's bankruptcy filing. And, most importantly, during that period, e-commerce market demand, which had "skyrocketed in 2020 and 2021," radically decreased in late 2021, which most directly led to the bankruptcy, as Thrasio's CFO stated in his declaration on the day Thrasio filed for bankruptcy. Burke Decl. ¶ 3.

**The Disinterested Directors' Report**

On May 23, 2024, Thrasio (as debtor) publicly filed the Disinterested Directors' Report ("DD Report") (Ex. C). The Disinterested Directors are two individuals appointed by Thrasio's board in September 2023 – about five months before Thrasio filed for bankruptcy – to investigate "potential estate causes of action against the Debtors' current or former directors, managers, officers, equity holders, subsidiaries, affiliates, and other related parties."

The report – conveniently for Thrasio's then-current leadership – concluded that the Debtors: (a) "potentially" have certain causes of action against four former officers and directors of Thrasio, led by Silberstein, whom the report defines as "Excluded Parties," and possibly against certain other persons involved in the so-called "Yardline" transactions (DD Report ¶¶ 6-7), but (b) have no viable causes of action against scores of other former or then-current officers, directors, managers, or other persons who operated or made critical decisions for Thrasio both before and after Silberstein left Thrasio in September 2021.

The DD Report, however, contains findings and statements that significantly undermine its self-serving conclusions – as well as the claims in this case – which identified "potential" claims against Silberstein and a handful of others while exonerating everyone else. For example, the report states that the Thrasio board learned in mid-August 2021 that Silberstein supposedly may have disseminated inaccurate financial statements. *After* supposedly learning this

information, and *after* Silberstein left Thrasio in September 2021 (*id*. ¶ 40), Thrasio's officers and board nevertheless proceeded to conclude the Series D equity financing – which closed in October and December 2021 – by which sophisticated investor groups, after thorough due diligence, invested over $1 billion in Thrasio on the basis that Thrasio at that time – again, *after* Silberstein's departure – had a value of $6 billion.  As the Disinterested Directors stated:

> . . . it is important to note that nearly all of the Yardline Transfers occurred prior to the October 2021 initial closing of the Series D Preferred Stock Financing, in which sophisticated third parties (such as Advent and Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence.  As a result, Thrasio likely had significant equity value at the time of most, if not all, of the Yardline Transfers . . . .

DD Report ¶ 45.

**The Confirmation Order and the Thrasio Legacy Trust**

The initial reorganization plan proposed by the Debtors on April 18, 2024 provided a measly $250,000 for distribution to general unsecured creditors (Bankr. Doc. 398 at 8 [defining "GUC Recovery Pool"]), which collectively held claims totaling: (a) according to the Debtors, about $67 million (Bankr. Doc. 397 at 109 [showing 0% recovery for unsecured creditors holding $67 million in claims]), or (b) according to the certified votes on the Plan, about $385 million (Bankr. Doc. 1100 at 6 [table showing ballots received and amounts claimed]).

This obviously was unacceptable to the unsecured creditors' committee, their counsel, and holders of unsecured claims. To appease them, and secure the votes of unsecured creditors to confirm a plan, the plan proponents devised a cynical scheme: eliminate the $250,000 set-aside for unsecured creditors and, instead, sue Silberstein and a handful of others on dubious claims that they supposedly harmed Thrasio and caused its bankruptcy, and distribute *a portion* of the proceeds from those suits to unsecured creditors (after recovery of costs and distributions to others). To further this scheme, the Plan established the Trust (the plaintiff in this case), funded it

with $5 million, and empowered it to pursue claims against Silberstein and a select few other Excluded Parties. Plan (Ex. D, pp. 105-06 of 152), definitions 163-177.[4]

## Procedural History

The Trust commenced this adversary proceeding on December 23, 2024 by filing the complaint in the Bankruptcy Court. Case No. 24-01637, Doc. 1. By so-ordered stipulations among all parties, the Bankruptcy Court: (a) extended the time for defendants to respond to the complaint until March 3, 2025, and (b) adjourned an initial pretrial conference from February 18, 2025 to April 22, 2025. No other proceedings have taken place in the adversary proceeding. Case No. 24-01637, Docs 38, 41.

In the underlying bankruptcy case, Thrasio (together with its many affiliated debtors) filed a chapter 11 petition on February 28, 2024. Bankr. Doc. 1. The Bankruptcy Court entered an order confirming the Plan on June 13, 2024. Ex. D. The Bankruptcy Court closed the bankruptcy case (of Thrasio and all its affiliated debtors) on August 22, 2024, and left open for any remaining matters the "Remaining Case of 1 Thrasio One, Inc. [the reorganized debtor], Case No. 24-11850." Bankr. Doc. 1983, p. 11 of 13. If the adversary proceeding that is the subject of this motion remained in the Bankruptcy Court, it would be the only remaining substantive matter in the Thrasio bankruptcy.

## Legal Standards

District courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11 [Bankruptcy], or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

---

[4] Exhibit D, Bankr. Doc. 1124, consists of the Bankruptcy Court's findings of fact, conclusions of law, and order confirming the Plan (pp. 1-85 of 152) and, as its Exhibit A, the Plan (pp. 86-152).

As authorized by 28 U.S.C. § 157(a), the District Court for the District of New Jersey has

provided that "any or all cases under title 11 and any or all proceedings arising under title 11 or

arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the

district." Standing Order of Reference 12-1 (Sept. 18, 2012) (available at

https://www.njd.uscourts.gov/sites/njd/files/StandingOrder12-1_0.pdf). A district court may

withdraw the reference, however, under 28 U.S.C. § 157(d), which states in full:

> The district court *may* withdraw, in whole or in part, any case or
> proceeding referred under this section, on its own motion or on timely
> motion of any party, for cause shown. The district court *shall*, on timely
> motion of a party, so withdraw a proceeding if the court determines that
> resolution of the proceeding requires consideration of both title 11 and
> other laws of the United States regulating organizations or activities
> affecting interstate commerce.

*Id.* (emphasis added).

This motion is brought under the first sentence of section 157(d), which provides for

*permissive* (rather than mandatory) withdrawal of the reference. Permissive withdrawal has two

requirements: (1) the motion must be "timely," and (2) there must be "cause shown." The district

court has discretion on whether to withdraw the reference, and the moving party bears the burden

of showing that withdrawal is appropriate. *Chatz as Tr. of Creditor Tr. created by Operation of

Amended Joint Liquidating Plan of Reorganization v. World Wide Wagering, Inc.*, No. 17 C

4229, 2018 WL 11189350, at *2 (N.D. Ill. Feb. 26, 2018).

The statute does not define "timely motion." "[T]he timeliness standard is flexible and

case-specific." *In re Enron Creditors Recovery Corp.*, 410 B.R. 374, 381 n.9 (S.D.N.Y. 2008).

This motion is patently timely (Point I below).

The statute also does not define "cause shown." Courts consider a variety of factors in

assessing this requirement. One set of factors is "whether the claim or proceeding is core or non-

core, whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law." *In re Orion Pictures Corp.*, <u>4 F.3d 1095, 1101</u> (2d Cir. 1993). Additionally, courts have found that "cause" exists "when there is a need for extensive discovery, expert testimony, a lengthy trial, or when the proceeding is exceptionally complex." 1 *Norton Bankr. L. & Prac.* 3d § 8:1 (2024 update) (hereinafter "Norton"); *In re Leedy Mortg. Co., Inc.*, <u>62 B.R. 303, 306</u> (E.D. Pa. 1986) ("bankruptcy courts do not commonly hear lengthy trials involving the law of contracts or negligence based on the law of a state foreign to the forum where extensive discovery and pretrial proceedings are necessary and inevitable"). Even when a case includes claims determined to be core to the bankruptcy proceedings, other factors may make withdrawal of the reference appropriate. *In re Complete Management, Inc.*, <u>2002 WL 31163878</u> at *2 (S.D.N.Y. Sept. 27, 2002).

There is compelling cause to withdraw the reference in this case (Points II.A through II.E below).

## ARGUMENT

## I.    THIS MOTION IS TIMELY

This motion is timely because there have been no substantive proceedings since the Trustee commenced the adversary proceeding by filing the complaint on December 3, 2024. Bankr. Case No. 24-01637, <u>Doc. 1</u>. The only proceedings since then have been so-ordered stipulations extending the time for defendants to respond to the complaint (to March 3, 2025) and adjourning the initial pretrial conference (to April 22, 2025). *Id*. Doc's 38, 41.

## II.     THERE IS COMPELLING CAUSE TO WITHDRAW THE REFERENCE IN THIS CASE

### A.     Most of the Claims are Non-Core; and Those That Are Core Are So in Name Only, Arise Under State Law, and Are Based on the Same Factual Allegations As the Non-Core Claims

Whether a proceeding involves core or non-core claim is one of the factors – not determinative – that a district court considers in deciding whether to withdraw the reference. The majority of the claims alleged in this case are non-core.

Bankruptcy Code § 157(b)(2) lists 16 non-excusive kinds of proceedings deemed to be core. One of those, subsection (H), reads: "proceedings to determine, avoid, or recover fraudulent conveyances." Of the 26 claims alleged in the complaint, 12 seek to avoid fraudulent transfers, citing 11 U.S.C. §§ 544 and 550.[5] These claims are deemed core because they fall within subsection (H), but they are so in name only, not substantively.

A debtor's claim to recover a fraudulent transfer *under the Bankruptcy Code* lies under 11 U.S.C. § 548, but that section applies only to transfers made "within 2 years before the date of the filing of the petition." § 548(a)(1). All 12 avoidance claims in this case concern transfers made more than two years before the petition date. The Trustee therefore brings those claims under section 544(b), which allows a trustee to invoke *state* fraudulent transfer laws with longer limitations periods. The fraudulent transfer claims in this case therefore do not involve bankruptcy (or federal) law, but rather state law (the complaint does not identify which state's law applies).

---

[5]  Counts 2, 3, 13-16, and 19-24. (The complaint uses the term "count," as if it were a criminal indictment, instead of "claim," the term used in the Federal Rules of Civil Procedure.) The 14 non-core claims allege: breach of fiduciary duty (Counts 1, 7, 9-12, 17-18), conspiracy (Counts 4, 25), a Delaware statute (Count 5), unjust enrichment (Count 6), and "waste of corporate assets" (Counts 8, 26). Each of the 26 claims is described in Point II.B below.

Furthermore, though "clothed" as fraudulent conveyance claims, these claims either do not involve conveyances at all or are based on the same factual allegations as other claims based on state law, and are not the kind of fraudulent conveyance claims that are typically litigated in bankruptcy court. Counts 13 and 14, for example, which seek to nullify mutual releases in a September 2021 separation agreement between Thrasio and Silberstein, invoke Bankruptcy Code §§ 544 and 550, but the agreement involved no transfers of funds. Rather, plaintiff alleges that, because of Silberstein's alleged "negligence and mismanagement," the value of Thrasio's releases of Silberstein exceeds the value of Silberstein's releases of Thrasio *and other obligations* that Silberstein assumed under the agreement. Complaint ¶ 249, 259.

Several of the claims involving "Yardline" also invoke Bankruptcy Code §§ 544 and 550 (Counts 19-24), but the factual allegations on which they are based are the same as the other Yardline-related claims based on state common law theories (Counts 17, 18, 25-26).

And the claims based on the 2020 tender offer (Counts 1-6), which do involve funds transfers, invoke Bankruptcy Code §§ 544 and 550 for only two of the six claims. All six claims are based on the same underlying facts for which the Trustee also alleges breach of fiduciary duty (Count 1), conspiracy (Count 4), the Delaware Corporation Law (Count 5), and unjust enrichment (Count 6).

The 12 claims that are technically core thus do not arise under bankruptcy law, do not involve the administration of the bankruptcy estate, and do not require bankruptcy court expertise. As the Third Circuit has stated, "a core proceeding under section 157 is one that invokes a *substantive* right provided by title 11 or one that by its nature, could arise only in the context of a bankruptcy case." *In re Resorts Intern. Inc.*, 372 F.3d 154, 162-63 (3d Cir. 2004)

(emphasis added, internal quotations and citations omitted). The core claims in this case invoke no substantive right under title 11 or one that could arise only in the context of bankruptcy.

Therefore, that some of the claims in this case are deemed to be core – technically but not substantively – neither prevents nor weighs against withdrawing the reference. *Complete Management, Inc.*, 2002 WL 31163878 at *2; *Leedy*, 62 B.R. at 306 (withdrawing reference based on other factors even though claim was core); Norton, *supra*, § 8:1 ("the statute does not premise withdrawal of the reference based on whether the matter is 'core' ('arises under' or 'arises in' the bankruptcy case) or whether it is 'noncore' ('related to' the bankruptcy)"); 1 *Collier on Bankruptcy* (16th ed.) ¶ 3.04 ("Section 157(d) applies to both core and non-core proceedings").

Furthermore, since the Supreme Court's decision in *Stern v. Marshal*, 564 U.S. 462 (2011), which dealt with bankruptcy courts' limited authority to enter judgments (*Stern* is further discussed in Point II.E below), courts in the Second Circuit have held that the core vs. non-core distinction in motions to withdraw the reference "has been supplanted by a determination of whether the bankruptcy court may finally determine a proceeding or whether the bankruptcy court's proposals must be reviewed *de novo* by a district court." *Roman Catholic Diocese of Rockville Centre, New York v. Certain Underwriters At Lloyds, London*, 634 B.R. 226, 234 (S.D.N.Y. 2021) (internal brackets and quotations omitted).

For these reasons, the fact that this adversary proceeding involves a mix of non-core and *non-substantive* core claims does not weigh at all against withdrawal of the reference, and is decisively outweighed by all of the other factors that support the withdrawal.

**B.    This Is an Exceptionally Complex Case; the Complaint Alleges Twenty-Six Claims Against Eleven Defendants**

This case is far from a typical bankruptcy court adversary proceeding between a debtor and a creditor. The complaint alleges 26 claims against 11 defendants. The defendants, represented by six law firms, include six individuals who were former officers and/or directors *of Thrasio*:

- Silberstein, co-founder and former co-CEO and Director. Complaint ¶ 30.

- Cashman, co-founder and former co-CEO, CEO, and Director. *Id.* ¶ 31.

- Daniel Boockvar, former President. *Id.* ¶ 32.

- Joseph Falcao, former CEO and Senior Vice President and Treasurer. *Id.* ¶ 33.

- Mounir Ouhadi, former Chief Supply Chain Officer. *Id.* ¶ 34.

- Aditya Rathod, former Vice President of Strategic Planning & Analysis. *Id.* ¶ 35.

One defendant, Ari Horowitz, had several roles: (i) former Thrasio employee (Senior Vice President of Strategic Partnerships & Corporate Development), (ii) former CEO of defendant Yardline, and (iii) current Chairman and CEO of non-party Swiftline. *Id.* ¶ 36.

The four entity defendants are:

- Millhouse, allegedly controlled by Silberstein. *Id.* ¶ 38.

- Cashman Family Investment II, LLC ("Cashman LLC"), allegedly controlled by Cashman. *Id.* ¶ 39.

- Hudson Palm LLC, allegedly controlled by Horowitz. *Id.* ¶ 37.

- Yardline Capital Corp. ("Yardline"), allegedly controlled by Horowitz. *Id.* ¶¶ 40, 36.

The 26 claims concern multiple events and in large part unrelated to one another, as summarized below.

Counts 1 through 6 relate to a tender offer made by Thrasio in July 2020 by which it purchased about $145 million of its shares, of which it paid about $62 million to five defendants and about $83 million to others including outside investors. The plaintiff seeks to recover the $62 million paid to defendants, and none of the $83 million paid to others. Complaint ¶¶ 59-64, 130-194.

Counts 7 and 8, against the six former Thrasio officers, allege that they breached fiduciary duties or wasted corporate assets by causing Thrasio to lack proper financial, accounting, and management controls, and that they over-purchased inventory. *Id*. ¶¶ 44-58, 195-214.

Counts 9 and 10, also against the six former Thrasio officers, concern sales of Thrasio shares by these defendants in the secondary market. The Trustee alleges that defendants, by lawfully selling shares that they owned – with the full knowledge, approval, and participation of Thrasio's board of directors – usurped corporate opportunities and misused confidential information of Thrasio in breach of their fiduciary duties. Again, the Trustee asserts claims regarding sales of shares only by defendants, and not by other insiders who also sold Thrasio shares in the secondary market. *Id*. ¶¶ 65-91, 215-232.

Count 11 is essentially a catch-all claim alleging that four of the individual defendants aided and abetted breaches of fiduciary duty by Cashman and Silberstein. *Id*. ¶¶ 233-237.

Counts 12 through 14 allege that mutual releases in a heavily negotiated written separation agreement between Thrasio and Silberstein, under which Silberstein resigned from Thrasio in September 2021, should be invalidated. *Id*. ¶¶ 120-125, 238-263. Count 12 is against Cashman who, as Thrasio's then CEO, allegedly acted wrongfully in approving the Silberstein separation agreement. In these counts, plaintiff makes the frivolous allegation that the separation

agreement between Thrasio and Silberstein was a fraudulent transfer from Thrasio to Silberstein, under an unspecified state's law, because Silberstein supposedly did not give Thrasio adequate consideration for the agreement, and seeks to recover from Silberstein "the value of the transfer" – whatever that may mean. *Id*. ¶¶ 246-263. Plaintiff makes this allegation even though the Disinterested Directors asserted in their report that "Thrasio obtained numerous benefits in entering into the Separation Agreement [describing the benefits]," and "concluded that there are no viable claims worthy of pursuit with respect to Thrasio's entry into the Separation Agreement." Ex. C ¶¶ 48-49.

Counts 15 and 16, against Cashman, similarly seek to invalidate the mutual releases contained in a separation agreement Thrasio entered into with Cashman about a year later, in August 2022. *Id*. ¶¶ 126-128 and 264-272.

Finally, plaintiff devotes 10 of its 26 claims, Counts 17 through 26, to a series of convoluted events, in 2020 and 2021, involving Thrasio and defendants Yardline and its then CEO, Horowitz. *Id*. ¶¶ 92-119, 284-375. At the heart of these allegations is Horowitz, an "old friend" of Cashman, *id*. ¶¶ 93, 118, with whom Silberstein "did not get along." *Id*. ¶ 94.[6]

In relation to these ten counts, the complaint alleges that Thrasio, largely by its then co-CEOs Cashman and Silberstein:

(a)     hired Horowitz as a senior vice president and granted him stock options (¶ 93),

(b)     fired him a year later (¶ 95),

(c)     entered into an advisory agreement with Horowitz (at which time Horowitz founded a separate company, Yardline) (¶¶ 95-96),

---

[6]  Horowitz's Thrasio-related work, initially as a Thrasio employee and later for Yardline, involved "providing debt financing to small companies that sold products on Amazon but were not yet ready to be acquired by Thrasio." Complaint ¶ 96.

(d)    enhanced the terms of Horowitz's options in Thrasio's stock (¶ 97),

(e)    invested $1 million in Yardline in exchange for two different kinds of Yardline stock (¶ 98),

(f)    held three of five seats on Yardline's board (¶ 102),

(g)    blocked Yardline's plan to raise $4 million in equity from outside investors (¶¶ 97, 100-110),

(h)    acquired control of Yardline and made it a Thrasio subsidiary (¶¶ 107-109),

(i)    bought Horowitz's shares in Yardline for $1.8 million (¶ 110),

(j)    paid off Yardline's convertible bondholders, who were upset that Yardline's equity financing fell through and threatened to sue (¶¶ 113-116), and

(k)    lastly – after Silverstein left Thrasio and Cashman remained as sole CEO – sold Yardline to Horowitz's newly-formed company, Swiftline "for $7.1 million in cash and $5 million in Swiftline stock" (¶¶ 117-119).

The net effect of these events over a two-year period, according to the plaintiff, is that Thrasio spent about $26 million in these Yardline-related events and recouped only $7.1 million plus the "dubious value" of $5 million in Swiftline stock. *Id*. ¶ 119. Invoking multiple legal theories in counts 17 to 26 – breach of fiduciary duty, aiding and abetting such breaches, avoidance of constructive and intentional fraudulent transfers (under state law), conspiracy, and "waste of corporate assets" – plaintiff seeks to recover the alleged net shortfall from nine of the eleven named defendants. *Id*. ¶¶ 284-375.[7]

---

[7]  Only the two entities allegedly controlled by Silberstein and Cashman – respectively, Millhouse and Cashman LLC – are not named in one or more of Counts 17 to 26.

79932960;1

This summary alone of the 26 claims plaintiff asserts in this case, against 11 defendants, demonstrates that this is an exceptionally complex case that categorically is not suitable to be litigated in a bankruptcy court.

### B.    The Case Will Require Very Extensive Discovery, Expert Witnesses in Multiple Disciplines, and a Lengthy Trial

The number of claims, the disparate underlying facts and time frames they involve, and the number of defendants, all guarantee that this case will require: (i) very extensive discovery – both documents and depositions; (ii) expert testimony in multiple disciplines; and (iii) a long trial with dozens of witnesses, in which defendants will be entitled to a jury.

*Documents*.  Silberstein took no documents, paper or electronic, when he left Thrasio in September 2021. He (like the other defendants) will need to obtain and review an enormous number of documents covering the entire period from Thrasio's formation in 2018 until it filed for bankruptcy in 2024.

To illustrate how voluminous document discovery will be, the Thrasio Disinterested Directors' report included the following table summarizing the number of documents they and their counsel obtained and reviewed:

| | DOCUMENT TYPE | NUMBER |
|---|---|---|
| 1. | Emails, Attachments, and Slack Messages | Received: 2,326,988<br>Search Term Hits:    102,344 |
| 2. | Debtor Corporate Documents | 1,100 |
| 3. | Virtual Data Room | 3,596 |
| 4. | Additional Documents Produced by the Debtors in Response to Subpoenas from the Committee | 62,445 |
| 5. | Documents Produced by Third Parties in Response to Subpoenas from the Committee | 14,881 |

- 17 -

DD Report ¶ 22.

*Depositions*. Dozens of persons will need to be deposed and are potential trial witnesses, including:

(a)      the seven individual defendants,

(b)      several Thrasio board members not named as defendants, who approved (or opposed) actions by Thrasio that plaintiff alleges some or all defendants instigated and that allegedly harmed Thrasio, such as the 2020 tender offer and the secondary sales of Thrasio shares,

(c)      other key former officers of Thrasio not named as defendants, such as Thrasio's long-time General Counsel, Michael Fahey; its former CFO, Bill Wafford; its former COO and CEO, Stephanie Fox; its former CEO, Greg Greeley; and its former CFO, Josh Burke,

(d)      representatives of each of the firms that collectively invested more than $2 billion in Thrasio's preferred stock offerings, such as Peak6, Advent, and Oaktree (*see* table on page 4 above),

(e)      representatives of PricewaterhouseCoopers ("PwC"), which audited Thrasio's financial statements for the year ended December 31, 2020, but did not issue its audit report until a year and a half later, on June 30, 2022, and on which many of the Trustee's allegations are based (*e.g.*, Complaint ¶¶ 48, 64, 82-83, 144), and

(f)      representatives of lenders that provided loans to Thrasio.

*Expert testimony*. Both sides will need to retain experts in several disciplines.

Accounting and audit experts will be needed to opine on Thrasio's financial statements, including (for example): (a) explanations for the differences between the 2020 *unaudited* financial statements used by Thrasio in mid-2021 and the *audited* statements for 2020 that were

not issued by PwC until June 2022, and (b) Thrasio's financial controls and accounting records at various times, which plaintiff now alleges were deficient and for which it blames several of the defendants. *E.g.*, Complaint ¶¶ 82-88, 211.

Business experts, especially with experience in internet commerce, will need to opine on the extent to which Thrasio's problems that led to its bankruptcy filing were caused by market conditions, particularly by the initial dramatic surge in internet commerce caused by the Covid pandemic (which began in early 2020), followed by a precipitous decline in such commerce as the pandemic eased (beginning in 2021). In a declaration by Thrasio's then CFO, Josh Burke, on the day Thrasio filed its bankruptcy petition (February 28, 2024), Thrasio attributed its downfall to such market conditions. Ex. B ¶ 3; *see also id.*, ¶¶ 42-49 (attributing Thrasio's problems to "strategic missteps," such as over-purchasing inventory and too much reliance on Amazon). Now, contradicting that position, the plaintiff alleges in conclusory fashion that "Defendants Drove Thrasio into Bankruptcy." Complaint ¶ 129.

Damages and valuation experts will also be needed, especially given that, for many of its claims, plaintiff seeks unspecified damages "in an amount to be determined at trial." Complaint, "Prayer for Relief" at 72-73. In addition, Thrasio's valuation will be relevant to plaintiff's repeated and conclusory allegations that, at various times, "Thrasio was insolvent." *E.g.*, Complaint ¶¶ 14, 43, etc. (the word "insolvent" appears 39 times in the complaint).

The need for extensive discovery, multiple experts, and a long trial strongly weigh in favor of withdrawing the reference. *Leedy*, 62 B.R. at 306; *Complete Management*, 2002 WL 31163878 at *2; *Norton* § 8:1.

C.     **This Post-Confirmation Adversary Proceeding,
Concerning Pre-Petition Claims, Requires No
Bankruptcy Court Involvement or Expertise**

Neither this adversary proceeding, nor the disposition of any recovery from it, requires the Bankruptcy Court's involvement or expertise.

All 26 claims allege conduct that occurred more than two years before Thrasio filed its chapter 11 petition on February 28, 2024. For example, the July 2020 tender offer, the subject of the first six claims, pre-dated the petition by three years and eight months. The secondary sales of shares, the subject of Counts 9 and 10, occurred in or before August 2021. All claims therefore could have been brought by Thrasio before it filed for bankruptcy and are unrelated to the administration of the now-closed bankruptcy case.

Further, all claims are based on *state* law. Bankruptcy Court expertise is not required to preside over such claims. *In re Leedy*, 62 B.R. at 306 (withdrawing reference where claim at issue was "very different from matters included in the typical administration of a bankrupt estate"); *Complete Management, Inc.*, 2002 WL 31163878 at *2 (withdrawing reference where all causes of action "raise issues outside of the special expertise of the Bankruptcy Court"); *In re NDEP Corp.*, 203 B.R. 905, 913 (D. Del. 1996) ("This case involves contract, tort and restitution claims. It is the type of diversity case routinely tried in federal court and is somewhat removed from the bankruptcy court's realm of expertise.").

Nor would the Bankruptcy Court's involvement be required or useful if plaintiff were to obtain any recovery in this case, by judgment or settlement. That is because the Plan, which authorized and empowered the Trust to bring claims against the defendants in this case, contains a precise formula for how – to whom and in what amounts – such proceeds would be

distributed.[8] *See also Resorts*, <u>372 F.3d at 171</u> ("the potential to increase assets of the Litigation Trust and its beneficiaries does not necessarily create a close nexus sufficient to confer 'related to' bankruptcy court jurisdiction post-confirmation.").

Further, on August 28, 2024, the Bankruptcy Court entered a "final decree" in the Thrasio bankruptcy case, which included the main debtor entity, Thrasio Holdings, Inc., and its many affiliated debtors. Bankr. <u>Doc. 1190</u>. The decree stated that the estate "has been fully administered" and "the case is closed." *Id*. Any proceedings thereafter relating to the closed estate were to be, and have been, filed in the "Remaining Case of 1 Thrasio One, Inc. [the reorganized debtor], Case No. 24-11850." Bankr. <u>Doc. 1983</u>, page 11 of 13. This adversary proceeding is the only substantive proceeding remaining in the Thrasio bankruptcy – further showing that the Bankruptcy Court's involvement in this adversary proceeding is neither required nor appropriate. *Resorts*, <u>372 F.3d at 164</u> ("bankruptcy court jurisdiction must be confined within appropriate limits and does not extend indefinitely, particularly after the confirmation of a plan and the closing of a case") (internal quotations and citation omitted).

This case thus involves claims brought months after the Plan was confirmed and the underlying chapter 11 case was closed; the claims, which concern pre-petition events, could have been brought before the bankruptcy petition was filed; and the claims do not concern or affect the administration of the now-closed estate or distributions to creditors. The claims in this case are like the post-confirmation claims by a liquidating trust against an accounting firm, which, the

---

[8] Distributions from any lawsuit proceeds are governed by a "waterfall" provision in the Plan (Ex. D pp. 122-23 of 152, ¶ 6) that would distribute: (a) the first $5 million – 80% to the Debtors and 20% to the Trust; (b) additional amounts – 70% to holders of Allowed First Lien Deficiency Claims ("A Interests") and 30% to holders of Allowed Other General Unsecured Claimants ("B Interests") until the A Interests have received $3.5 million; and (c) further additional amounts – split 50/50 between the A Interests and the B Interests.

Third circuit held, are not core proceedings. *Resorts*, 372 F.3d at 163 ("It is not a proceeding that invokes a *substantive* right provided by title 11 or a proceeding that, by its nature, could arise only in the context of a bankruptcy case . . . [and] does not directly affect the debtor or the liquidation of the estate's assets.") (emphasis added); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) ("bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor").

The Plan's *general* clause stating that the Bankruptcy Court retains jurisdiction over all matters relating to the chapter 11 case, including "any Vested Cause of Action," is not dispositive of jurisdiction. Ex. D p. 85 of 152. Vested Cause of Action is defined to include claims by the Trustee against "Excluded Parties" – *i.e.*, defendants in this case. *Id*. at 106 of 152 (definition 182); *id*. at 97 of 152 (definition 75). General reservations of jurisdiction of this kind do not establish that a post-confirmation proceeding is sufficiently related to the bankruptcy case so that a bankruptcy court may exercise jurisdiction over it. *In re BWI Liquidating Corp.*, 437 B.R. 160, 166 (Bankr., D. Del. 2012), citing *Resorts,* 372 F.3d at 167. As the Third Circuit aptly stated in *Resorts*, in holding that the bankruptcy court lacked "related to" jurisdiction over accounting malpractice claims brought by a plan-created litigation trust like the one in this case:

> The resolution of these malpractice claims will not affect the estate; it will have only incidental effect on the reorganized debtor; it will not interfere with the implementation of the Reorganization Plan; though it will affect the former creditors as Litigation Trust beneficiaries, they no longer have a close nexus to bankruptcy plan or proceeding because they exchanged their creditor status to attain rights to the litigation claims; and as stated, the jurisdictional retention plans cannot confer jurisdiction greater than that granted under 28 U.S.C. § 1334 or 28 U.S.C. § 157.

*Resorts,* 372 F.3d at 169.  The same is true in this case.

### E.     The Bankruptcy Court Lacks Article III Jurisdiction To Enter Judgment on Most of the Claims or Hold a Jury Trial on All Claims

A further reason for withdrawing the reference is that the Bankruptcy Court lacks Article III jurisdiction to either enter judgment on the non-core claims, which are the majority of claims alleged in the complaint, or to hold a jury trial on all claims.

The Supreme Court made clear in *Stern v. Marshal*, 564 U.S. 462 (2011), that a bankruptcy court may "enter final judgments only in core proceedings" . . . and may not "resolve and enter final judgment on a state common law claim." *Id*. at 487-88. *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55-56 (1989) (bankruptcy court lacked jurisdiction to adjudicate a fraudulent conveyance claim by a bankruptcy trustee against a third party"); *In re One2One Commc'ns, LLC*, 805 F.3d 428, 433 (3d Cir. 2015) ("*Stern* made clear that non-Article III bankruptcy judges do not have the constitutional authority to adjudicate a claim that is exclusively based upon a legal right grounded in state law"); *Roman Catholic Diocese*, 634 B.R. at 239 ("The bankruptcy court does not have final adjudicative authority over the "non-core" claims at issue, which strongly weighs in favor of withdrawal of the reference.").

That any recovery by the Trustee in this case would increase the estate or allow distributions to creditors does not change this fact. *Stern*, 564 U.S. at 495 (a claim at "common law that simply attempts to augment the bankruptcy estate . . . must be decided by an Article III court").

Nor does a bankruptcy court have Article III jurisdiction to hold jury trials if doing so would violate a non-consenting party's Seventh Amendment right to a jury trial, as they would in this case. In *Granfinanciera*, the Supreme Court held that the Seventh Amendment entitled defendants to a jury trial in a suit by a chapter 11 trustee to recover fraudulent conveyances, "notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings'

in 28 U.S.C.A. § 157(b)(2)(H)." 492 U.S. at 36. The Court identified two main factors to consider: (1) whether the action was deemed to be at law or in equity in 18th-century England, and (2) whether the remedy sought is legal or equitable in nature, and stated that the second element "is more important than the first." *Id*. at 42. The Court concluded that (1) there was "no dispute" that fraudulent conveyance claims were "brought at law [rather than in equity] in late 18th-century England," *id*., and (2) the remedy sought was legal, not equitable, because the trustee sought to recover "money payments of ascertained and definite amounts," and did not seek "an accounting or other equitable relief." *Id*. at 49.

The same is true in this case: the relief sought in the complaint consists of damages and the return of money from defendants, and seeks no injunctive or other equitable relief. Complaint at 72-73 (Prayer for Relief). Defendants thus have a Seventh Amendment right to a jury trial on all 26 claims.[9]

The Supreme Court continues to follow the holding and reasoning of *Granfinanciera* regarding the right to a jury trial. *Securities and Exchange Commission v. Jarkesy*, 603 U.S. 109, 121 (2024) ("Our analysis of this question follows the approach set forth in *Granfinanciera* [and one other case]."). *See also* 28 U.S.C. § 157(e) (a jury trial of non-core claims by a bankruptcy court requires "the express consent of all parties").

_____

[9]  There is no right to a jury trial when a "creditor has submitted a claim against the estate" that becomes "part of the process of allowance and disallowance of claims." *Granfinanciera*, 492 U.S. at 58; *In re Tribune Media Co.*, 902 F.3d 384, 397 (3d Cir. 2018) ("there is no Seventh Amendment right to a jury trial for determination of objections to claims"). Silberstein filed a *defensive* proof of claim (Ex. E) solely to preserve his rights under the separation agreement (*id*. at Addendum ¶ 4), without seeking any recovery from the estate, expressly reserving his right to a jury trial (*id*. ¶ 8), as to which Thrasio filed no objection, and which the Bankruptcy Court did not consider or rule on. Silberstein therefore did not give up his right to a jury trial. *Germain v. Connecticut Nat. Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993) (Filing a proof of claim does not "automatically" waive the right to a jury. "For a waiver to occur, the dispute must be part of the claims-allowance process or affect the hierarchical reordering of creditors' claims.").

- 24 -

The District Court thus will need to exercise its Article III jurisdiction over this case sooner or later, including conducting a jury trial, and considering the legal and factual issues independently, *de novo*. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 671 (2015) (absent all parties' consent, "bankruptcy courts in non-core proceedings may only submit proposed findings of fact and conclusions of law, which the district courts review *de novo*") (citation and internal quotations omitted). Although district courts sometimes allow the bankruptcy court to preside over pretrial proceedings before trial is conducted in the district court, *Orion* at 1101-02, the particular circumstances in this case – elaborated on above – would make that a poor choice.

Considering the totality of the factors discussed above – it will be far more efficient, and avoid duplication of effort between the District Court and the Bankruptcy Court, for the District Court to withdraw the reference at this time. *See*, *e.g.*, *In re Dandridge*, 2019 WL 6337420, at \*2 (W.D. Va. Nov. 26, 2019) (withdrawing the reference "immediately, rather than waiting until a jury trial is imminent . . . [to] avoid duplicative efforts, promote judicial economy, and aid in the efficient and expeditious resolution of the Trustee's claims against the Defendant") (internal quotations and citation omitted); *Adelsperger as Trustee for Consolidated Bankruptcy Estate of 5 Star Commercial, LLC v. 3d Holographics Medical Imaging Inc.*, 2019 WL 2206091, at \*4 (N.D. Ind. May 21, 2019) (withdrawing reference as to entire adversary complaint where core and non-core claims were "intertwined" and "it would be impractical to separate them").

- 25 -

**Conclusion**

For the foregoing reasons, the District Court should withdraw the standing reference to the Bankruptcy Court and assume jurisdiction over this case.

Dated:  February 18, 2025

*s/ Mark S. Lichtenstein*

_____

Martin Domb (application *pro hac vice* pending)
martin.domb@akerman.com
Mark S. Lichtenstein
mark.lichtenstein@akerman.com
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel.: (212) 880-3800

John Thompson (application *pro hac vice* pending)
john.thompson@akerman.com
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel.: (202) 824-1760

*Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| 1 THRASIO ONE, INC., | Case No. 24-11850 (CMG) |
| *Reorganized Debtor.*[1] | (Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust, | Adv. Pro. No. _____ |
| *Plaintiff,* | |
| v. | |
| JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; and YARDLINE CAPITAL CORP., | |
| *Defendants.* | |

## **COMPLAINT**

---

[1] The last four digits of Reorganized Debtor's tax identification number are 4771. The Reorganized Debtor's service address for purposes of this chapter 11 case is 85 West Street, 3rd Floor, Walpole, MA, 02081.